UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARK JACOBS,                          )
                                      )
        Plaintiff,                    )
                                      )
    vs.                               )      Case No. 2:13-CV-30 (CEJ)
                                      )
CAROLYN W. COLVIN, Commissioner       )
of Social Security,                   )
                                      )
        Defendant.                    )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On December 26, 2007, plaintiff Mark Jacobs filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, (Tr. 173-184), with an alleged onset date of October 28, 2007. After plaintiff's application was denied on initial consideration (Tr. 73-77), he requested a hearing before an Administrative Law Judge (ALJ). See Tr. 79-87 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on November 6, 2009. (Tr. 38-52). The ALJ issued a decision on January 14, 2010 denying plaintiff's application. (Tr. 59-64). The Appeals Council granted plaintiff's request for review on January 12, 2011. The Appeals Council vacated the decision and remanded with instructions. (Tr. 70-72).

Plaintiff and counsel appeared for a second hearing on August 1, 2011. (Tr. 17-37). The ALJ issued a decision on October 26, 2011 denying plaintiff's application (Tr. 8-16), and the Appeals Council denied plaintiff's request for review on January 29, 2013. Accordingly, this decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 204-210), plaintiff listed his disabling conditions as "neck problems [and] leg problems." He listed his past employment as an assembly worker at a factory, a fast food cook, a nurse's aide at a nursing home, and a truck driver. Plaintiff wrote that he takes Tylenol for pain. In his Appeals Disability Report (Tr. 230-236), plaintiff stated that he has a serious disc condition in his lower back.

In his Supplemental Report (Tr. 211-218), plaintiff wrote that he experiences numbness in his extremities and is unable to walk on his left leg for more than 100 feet without pain and swelling. Plaintiff stated that he sometimes uses a cane for balance. Plaintiff claimed that he is unable to make a bed, iron, vacuum, rake leaves, or garden. Plaintiff claimed that he is able to drive, perform car maintenance and minor home repairs, laundry and dishes if he is sitting, and can take out the trash. He stated that he goes shopping with his wife once a week, but often waits in the car. Plaintiff wrote that he is unable to fall asleep before 2:00 a.m. On an average day, plaintiff sits with his legs elevated and uses the computer. Plaintiff wrote that he does not have any difficulties following written or verbal instructions or getting along with people.

### B. Hearing on November 6, 2009

At the time of the hearing, plaintiff was 30 years old. (Tr. 40). Plaintiff completed the tenth grade and obtained a GED. (Tr. 40-41). Plaintiff testified that he cannot sit or stand for longer than 15 minutes and cannot walk farther than one block. (Tr. 41, 47). Plaintiff stated that sitting for more than 15 minutes causes leg numbness and that most activities cause arm numbness. (Tr. 46). Plaintiff testified that he quit his last job as a truck driver because of a frequent need to take breaks. (Tr. 44-45). Plaintiff

testified that he suffers from a "spine problem" and cellulitis that causes severe pain and swelling in his leg. (Tr. 45). Plaintiff stated that he often sleeps two hours per night and cannot fall asleep until 4:00 a.m. Plaintiff stated that lack of sleep causes him to have a poor memory. Plaintiff testified that is able to wash his upper body, but that his wife helps him wash his lower body because he has difficulty bending. (Tr. 47). Plaintiff stated that he sometimes relies on a cane or a walker to ambulate. (Tr. 48).

Cary Bartlow, Ph.D., a vocational expert, provided testimony regarding plaintiff's past work. (Tr. 48-51). Dr. Bartlow listed plaintiff's vocational history and classified each position. Dr. Bartlow listed assembly worker in the heating and cooling industry as medium, semi-skilled work; fast food cook as light, unskilled work; nurse's aide as medium, semi-skilled work; truck driver as medium, semi-skilled work; hand packer as medium, unskilled work; and stocker as heavy, semi-skilled work. (Tr. 49). Dr. Bartlow testified that none of plaintiff's previous jobs could be performed by an individual who cannot use his hands because of numbness. Dr. Bartlow also testified that an individual, who is unable to sit or stand for more than 10 to 15 minutes, could not perform light, medium, or heavy work. (Tr. 50).

### C. Hearing on August 1, 2011

At the time of the hearing, plaintiff lived with his mother, wife, and two children, ages eight and twelve. (Tr. 21). Plaintiff testified that he previously worked as an "over-the-road truck driver" and had a CDL driver's license. Plaintiff testified that he stopped working in December 2007 because of pain and swelling in his legs. (Tr. 23-25). Plaintiff testified that his back pain increased after surgery. Plaintiff stated that prior to the surgery he was able to drive 200 to 300 miles before experiencing numbness in his legs, but that he now experiences numbness after 30 minutes of

driving. (Tr. 25). Plaintiff testified to an inability to sit or stand for longer than 15 minutes or walk longer than 20 minutes. (Tr. 26-27). Plaintiff stated that he takes 40mg of Lasix[1] each morning, which has not eliminated the swelling, but does make him feel less bloated. (Tr. 27-28). Plaintiff testified that he sees a pain management specialist, but has not received any pain treatments because the doctor will not administer treatment when his leg is swollen. However, plaintiff testified that, at the time of hearing, his leg had not been swollen for approximately 3 months. (Tr. 28-29).

Plaintiff stated that he cooks and does dishes once a month and that he sweeps the floor once a week. (Tr. 29-30). Plaintiff stated that his wife does not let him do the laundry and that he has taken the trash out twice since his surgery. (Tr. 30). Plaintiff stated that he is able to drive and goes out three times a week to shop with his wife or get cigarettes. (Tr. 30-31). Plaintiff stated that he requires help from his wife to brush his hair and to pull his pants up to where he can reach them. He stated that he is able to read newspapers, books, and magazines and uses the computer once a week. (Tr. 32). Plaintiff explained that he was starting to feel better, but that in July 2009 he "stepped in a hole" and his condition became worse. (Tr. 32-33).

Denise Waddell, a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities. (Tr. 48-51). Ms. Waddell classified plaintiff's previous truck driver position as semi-skilled, medium exertional level, with a Specific Vocational Preparation (SVP) level of 4.[2]

---

[1] Lasix is the brand name for Furosemide, a "water pill" used to reduce swelling and water retention.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858. html (last visited on Nov. 13, 2013).

[2] The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d

The ALJ asked Ms. Waddell about the available employment opportunities for a hypothetical individual, with the same age, education, and vocational background as plaintiff, requiring a light limitation on exertion, a 20-minute sit/stand option, who can occasionally climb ramps and stairs, balance and stoop, who cannot work overhead, who is unable to climb ropes, ladders, or scaffolds or kneel crouch or crawl, and who cannot be exposed to temperature extremes or vibrations. (Tr. 34-35). Ms. Waddell stated that such an individual could perform at the unskilled, light exertional level, with an SVP of 2.[3] Ms. Waddell stated that the individual could work as a price marker (of which there are 2,050 jobs within the state of Missouri), a collator operator (of which there are 1,100 jobs within the state of Missouri), or a bench assembler (of which there are 2,700 jobs within the state of Missouri). (Tr. 35).

The ALJ then asked about the available employment opportunities for the same hypothetical individual, but with a 15-minute sit/stand option, a 10-pound maximum lifting and carrying ability, and a requirement that the individual must able to keep his legs elevated 6 inches from the floor. Ms. Waddell stated that all of the previously listed jobs could be performed. (Tr. 35). Ms. Waddell further testified that these jobs could be performed even if the individual could only understand, remember, and carry out simple instructions, make only simple work-related decisions, and deal with only occasional changes in work processes and environment. (Tr. 35-36). However, Ms. Waddell testified that the individual would be precluded from employment if he

917, 923 (8th Cir. 2010). At SVP level 4, the occupation requires over 3 months up to and including 6 months.  20 C.F.R. § 656.3.

[3] At SVP level 4, the occupation requires anything beyond short demonstration up to and including 30 days.  20 C.F.R. § 656.3.

required an additional 15-minute work break at random times during the work day or if the individual was unable to work more than one day per month. (Tr. 36).

### D.  Medical Evidence

On October 30, 2007, plaintiff went to the emergency department at Hedrick Medical Center with complaints of a cough, sore throat, and left lower extremity pain, swelling, and erythema. (Tr. 251-254). Plaintiff stated that the swelling began three days prior. (Tr. 276). A chest x-ray revealed normal results (Tr. 249), and a venous duplex of plaintiff's left lower extremities was negative for deep vein thrombosis. (Tr. 250). Plaintiff was discharged from the hospital on November 3, 2007 with a final diagnosis of cellulitis of the left lower extremity. Plaintiff was given Ibroprofen, Lotrisone cream,[4] Vicoden,[5] and Cleocin.[6] The discharge summary stated that plaintiff's prognosis was good. (Tr. 265-283).

On November 8, 2007, patient saw Gregory Sensenich, D.O. for a hospitalization follow up. Plaintiff reported "doing very well." (Tr. 289). On November 26, 2007, plaintiff returned to Dr. Sensenich with complaints of swelling in the left lower extremity. (Tr. 288). Plaintiff underwent another venous duplex, which was again negative for deep vein thrombosis. (Tr. 292). On December 24, 2007, plaintiff saw Dr. Sensenich with complaints of left lower extremity discomfort with occasional swelling.

---

[4] Lotrisone Cream is the brand name for Clotrimazole and is used to treat yeast infections of the vagina, mouth, and skin. http://www.nlm.nih.gov/medlineplus/drug info/meds/a682753.html (last visited Nov. 18, 2014).

[5] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.  Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[6] Cleocin is the brand name for Clindamycin and is an antibiotic used to treat certain types of bacterial infections of the lungs, skin, and blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682399.html (last visited Nov, 18, 2013).

Dr. Sensenich wrote that he would consult with a vascular physician in order to rule out an arterial problem. (Tr. 287). On December 28, 2007, plaintiff saw Michael Mancina, M.D. for a lower extremity arterial duplex. Dr. Mancina wrote that plaintiff might have pseudoclaudication from a neurologic or musculoskeletal source. (Tr. 290-291).

On January 14, 2008, plaintiff saw Dr. Sensenich for a follow up appointment. Dr. Sensenich wrote that plaintiff was "doing fairly well at this time, without any specific complaints voiced, except for some neck spasm and tightness." Dr. Sensenich referred to a January 2005 MRI of plaintiff's cervical spine, which revealed bulging at C5-6 without impingement. Plaintiff was prescribed Skelaxin[7] and was instructed to apply heat to lower extremities. (Tr. 286). On February 4, 2008, plaintiff saw Dr. Sensenich with complaints of intermittent swelling of his left lower extremity when ambulating. Plaintiff was prescribed Neurontin.[8] (Tr. 285). On March 3, 2008, plaintiff and Dr. Sensenich discussed the need for a magnetic resonance angiogram (MRA) of the left lower extremity, but plaintiff did not schedule the test due to insurance issues. (Tr. 404).

On April 1, 2008, plaintiff saw Jessica Haney, M.D. with complaints of left lower extremity edema, pain, and disturbed sensations. Dr. Haney prescribed Lasix and noted plaintiff's obesity and recent weight gain. (Tr. 445). On April 9, 2008, plaintiff

---

[7] Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1685 (60th ed. 2006).

[8] Neurontin is used to treat certain types of seizures in people with epilepsy and to relieve the pain of postherpetic neuralgia, the pain or aches that may occur after an attack of shingles. It is also prescribed for the treatment of restless leg syndrome, neuropathy, and hot flashes. It may be prescribed for other uses as well. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited on Nov. 18, 2013).

underwent an MRI of the lumbar spine. The results showed spondylolysis at L5 with Grade 1 spondylolisthesis and degenerative disc at L5-S1 associated with Type 1 marrow degenerative change. (Tr. 400-401). On April 21, 2008, plaintiff saw Dr. Haney for a follow up regarding leg pain. Dr. Haney listed lumbago and degenerative disc disease as her impressions. (Tr. 446). On April 30, 2008, plaintiff was given a lumbar steroid epidural injection. (Tr. 402).

On May 29, 2008, plaintiff saw Dr. Haney for a one month follow up and was instructed to continue physical therapy at home and take pain medication as needed. (Tr. 447). On June 23, 2008, plaintiff returned to Dr. Haney who wrote that the lumbago was controlled with pain medication. (Tr. 448). On September 23, 2008, plaintiff returned to Dr. Haney for a follow up regarding his degenerative disc disease. Plaintiff was told to continue taking pain medication as needed. (Tr. 449). On September 30, 2008, plaintiff saw Dr. Haney for a lower left extremity "knot." Dr. Haney wrote that plaintiff's edema was "dependent due to obesity," encouraged weight loss, and instructed plaintiff to take diuretics[9] as needed. (Tr. 450). On October 30, 2008, Dr. Haney wrote that the edema was improving with diuretics. (Tr. 451).

On November 3, 2008, plaintiff underwent an x-ray of his lumbosacral spine due to complaints of low back pain. The results revealed grade 2 anterolisthesis of L5 on S1 with associated L5 pars defects and lumbar curvature with convexity to the left. (Tr. 293-294). On December 4, 2008, plaintiff underwent a transforaminal epidural nerve root injection at the Columbia Regional Hospital. (Tr. 300-306). On December 8, 2008, plaintiff returned to the hospital for a follow up with Diane Mueller, APRN, complaining

---

[9] Diuretics, sometimes called water pills, help rid the body of sodium and water. http://www.mayoclinic.com/health/diuretics/HI00030 (last visited Nov. 19, 2013).

of pain radiating from his lower back to his lower left extremity. Plaintiff reported that he was without pain for only one day after the injection. Ms. Mueller counseled plaintiff on smoking cessation and weight loss. (Tr. 296-299).

On January 2, 2009, plaintiff saw Craig Kuhns, M.D. (Tr. 316-318). Plaintiff reported that his symptoms were getting progressively worse and that he had back pain radiating down to his left leg when standing or walking. (Tr. 314). X-rays were obtained of plaintiff's chest and lumbosacral spine. The results of the chest x-ray were normal, while the lumbosacral spine x-ray identified grade 2 anterolisthesis. (Tr. 307-308, 319). Dr. Kuhns wrote that plaintiff required an L5-S1 posterior decompression with interbody fusion with iliac crest bone graft for isthmic spondylolisthesis. Dr. Kuhns told plaintiff that the procedure would not entirely eliminate the pain. The procedure was performed on January 26, 2009 and plaintiff was given post-surgical exertional restrictions. (Tr. 359-360, 364-398, 418-443).

On February 17, 2009, plaintiff underwent an MRI of the lumbar spine. The results revealed status post stabilization at L5-S1 with laminectomy, degenerative disc at L5-S1, and subcutaneous fluid collection. (Tr. 403). On February 20, 2009, plaintiff reported to Dr. Kuhns that he was "doing quite well" with some right leg pain radiating down to his posterior calf. Dr. Kuhns wrote that he thought plaintiff's symptoms were "coming from the fact things are starting to move a little bit and irritate his nerve roots and also due to swelling." Dr. Kuhns informed plaintiff that smoking cigarettes could cause nonunion. A physical examination revealed 5/5 extremity strength, no edema, and negative straight-leg raise. Plaintiff was given Vicodin and Neurontin, but was told he would not receive another pain prescription. (Tr. 321-327). A lumbosacral spine x-

ray showed that the degree of anterolisthesis appeared slightly greater compared to the January 2009 scan. (Tr. 328-329).

On March 19, 2009, plaintiff returned to Dr. Kuhns and reported feeling "much better" with decreased pain. Plaintiff stated that he could walk farther distances and had the ability to sit or stand for about one hour before experiencing moderate back pain. Plaintiff was encouraged to engage in brisk walking to help with overall strength and cardiovascular health. (Tr. 332-334). A lumbosacral spine x-ray showed "stable" results (Tr. 340-341).

On June 23, 2009, plaintiff saw Dr. Kuhns for a six month post spinal fusion follow up. Plaintiff reported that his symptoms had improved since his last visit. Plaintiff stated that despite being unable to lift heavy objects, he made progress and resumed his regular activities of daily living. A physical examination showed that plaintiff could rise from a chair and walk without significant difficulty. Dr. Kuhns instructed plaintiff to continue gradually increasing his activity and that a follow up appointment would not be needed for one year. (Tr. 345-351). A lumbosacral spine x-ray reflected "stable L5-S1 PSF and ASF since 3-19-09." (Tr. 352).

On July 8, 2009, plaintiff saw Richard Wolkowitz, M.D. as an outpatient in the pain clinic. Plaintiff reported that his lower extremity pain was resolved and no longer required pain medication, but that in early June 2009 he stepped into a hole, triggering severe right-side neck pain. Dr. Wolkowitz wrote that plaintiff was not disabled and worked as a truck driver. His diagnosis included cervicalgia, neck spasm, and possible post-fall cervical spondylolsis/facet arthropathy. Plaintiff was prescribed Flagyl and

instructed to perform "routine neck stretching exercises."[10] (Tr. 405-407). On July 28, 2009, plaintiff returned to Dr. Wolkowitz for a follow up. Dr. Wolkowitz noted that plaintiff had cellulitis of his left lower extremity and was given Bactrim Double Strength.[11] (Tr. 408-410).

Plaintiff saw Terry Thrasher, D.O. on January 23, 2009, April 4, 2009, June 9, 2009, and September 8, 2009. The treatment notes are mostly illegible; however, the legible portions reflect a diagnosis of edema and complaints of foot pain, leg pain, and cellulitis. (Tr. 411-414).

On February 6, 2011, plaintiff presented to Pershing Memorial Hospital with complaints of lower left leg swelling and redness. The clinical impression was described as erysipelas[12] of the lower left extremity. Plaintiff was prescribed Keflex.[13] (Tr. 459-467). On June 14, 2011, plaintiff went to the Vascular Surgery Clinic. The notes state that plaintiff had lymphedema and recurrent cellulitis because of bilateral edema below the calves. Plaintiff was prescribed high knee compression stockings and was instructed that the stockings would likely reduce his edema and cellulitis. (Tr. 468-471).

---

[10] Flagyl is the brand name for Metronidazole, which is used to eliminate bacteria and other microorganisms that cause infections of the reproductive system, gastrointestinal tract, skin, and other areas of the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689011.html (last visited Nov. 18, 2013).

[11] Bactrim is the brand name for Co-trimoxazole, which is used to eliminate bacteria that causes infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684026.html (last visited Nov. 18, 2013).

[12] Erysipelas (cellulitis) is a type of skin infection. http://www.nlm.nih.gov/medlineplus/ency/article/000618.htm (last visited Nov. 19, 2013).

[13] Keflex, the brand name for Cephalexin, is an antibiotic used to treat certain infections caused by bacteria. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682733.html (last visited Nov. 19, 2013).

## III. The ALJ's Decision

In the decision issued on October 26, 2011, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2012.

2. Plaintiff has not engaged in substantial gainful activity since December 28, 2007, the alleged onset date.

3. Plaintiff has the following severe physical impairments: disorders of the lumbar spine, discogenic and degenerative status post L5-S1 fusion, and cervical degenerative disc disease.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity (RFC) to perform less than the full range of light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except that plaintiff: can lift and carry up to 10 pounds maximum, albeit frequently; occasionally climb ramps and stairs, balance, and stoop; never kneel, crouch, crawl, and climb ropes, ladders, or scaffolds; requires a sit/stand option ever 15 minutes; perform no work overhead; avoid exposure to temperatures of 80 degrees or more and 65 degrees or less; avoid exposure to vibration; and due to pain and symptomatology, understand, remember, and carry out only simple instructions; make only simple work related decisions; and deal with only occasional changes in work processes and environment.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on February 17, 1979 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Plaintiff has a "high school graduate or more" level of education and is able to communicate in English.

9. Plaintiff's acquired job skills do not transfer to other occupations.

10. Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from December 28, 2007, through the date of this decision.

(Tr. 8-16).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If

the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are

-14-

inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred in determining his RFC by (1) failing to rely on medical evidence; (2) failing to develop the record; (3) improperly rejecting plaintiff's testimony; (4) improperly evaluating plaintiff's obesity; and (5) failing to

-15-

consider plaintiff's lower extremity edema and cellulitis. Plaintiff also argues that the ALJ relied on erroneous vocational expert testimony. [Doc. #12].

### A. Residual Functional Capacity

### Reliance on Medical Evidence

Plaintiff argues that the ALJ formulated the RFC without citing any medical authority for the limitations imposed.

The ALJ determined that plaintiff has the RFC to perform less than the full range of "light work," as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that the claimant can lift and carry up to 10 pounds maximum, albeit frequently; occasionally climb ramps and stairs, balance, and stoop; never kneel, crouch, crawl, and climb ropes, ladders, or scaffolds; requires a sit/stand option every 15 minutes; perform no work overhead; avoid exposure to temperatures of 80 degrees or more and 65 degrees or less; avoid exposure to vibration; and due to pain and symptomatology, understand, remember, and carry out only simple instructions; make only simple work related decisions; and deal with only occasional changes in work processes and environment.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted); 20 C.F.R. § 404.1545(a)(1). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citation omitted). However, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2),

416.946 (2006)); see also Dykes v. Apfel, 223 F.3d 665, 666 (8th Cir. 2000) (RFC is a determination based on all record evidence, not only medical evidence).

The ALJ's decision contains numerous references to plaintiff's medical record. The ALJ acknowledged that plaintiff's MRI was positive for a bulging disc at C5-6 and spondylolysis; that plaintiff sought medical treatment for neck discomfort and tightness; that plaintiff underwent surgery for L5-S1 decompression and fusion; and that plaintiff sought services from a pain clinic after stepping into a hole. The ALJ also took note of treatment records reflecting plaintiff's increased improvement, which included Dr. Kuhns' report that plaintiff had resumed regular activities of daily living and that plaintiff was encouraged to increase physical activities. The ALJ acknowledged plaintiff's use of a cane, but observed that it was not prescribed by a physician. The ALJ also noted that plaintiff's physical examinations showed full range of motion and no evidence of tenderness, weakness, or numbness and that plaintiff's left lower extremity pain had been resolved to the point that narcotic medications were no longer necessary. The ALJ further considered the fact that the only exertional limitations placed on plaintiff involved post-surgical, temporary restrictions.

"The Eighth Circuit has held that an ALJ does not fail in his duty to assess a claimant's RFC merely because the ALJ does not explicitly address all functional areas where it is clear he implicitly found the claimant not limited in those areas." Watson v. Colvin, 1:11-CV-209 (E.D. Mo. Nov. 6, 2013) (citing Depover v. Barnhart, 349 F.3d 563, 567-68 (8th Cir. 2003)). "Although the ALJ did not follow each RFC limitation with a specific list of evidence supporting it, the opinion as a whole demonstrates that he fully considered all relevant evidence of record and based his RFC upon it." See Jamerson v. Colvin, 4:10-CV-2070 (E.D. Mo. Nov. 6, 2013).

-17-

In the instant case, the ALJ discussed the plaintiff's medical evidence in detail, reiterated findings from studies and physical examinations, and discussed plaintiff's subjective reports to his treating physicians. Such a detailed analysis does not support a finding that the ALJ made his own medical determinations or failed to rely on medical evidence.

## Development of the Record

Plaintiff argues that the ALJ erred by not obtaining "additional evidence to ascertain plaintiff's true capacities."

"It is the claimant's burden, not the Commissioner's to prove RFC." Pearsall, 274 F.3d at 1217; 20 C.F.R. §§ 404.1512. However, "[t]he ALJ's duty to develop the record exists independent of the claimant's burden in the case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). This duty includes re-contacting medical sources or ordering a consultative examination when additional information is necessary for an informed decision. Bradford v. Colvin, 4:12-CV-1234 (E.D. Mo. Sept. 23, 2013) (citing Haley v. Massanari, 258 F.3d 741, 749 (8th Cir. 2001)). Nonetheless, the ALJ need not order a consultative examination or re-contact physicians if the record contains substantial evidence to support the decision. Id.; see also Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

The Court finds that the record contains substantial evidence from which the ALJ could make a determination. The record demonstrates that plaintiff's treating physicians did not place any exertional limitations on plaintiff that were not for post-surgical reasons. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) ("The lack of physical restrictions militates against a finding of total disability."). The ALJ discussed plaintiff's reported ability to partake in various daily activities as well as plaintiff's

comment to Dr. Kuhns that he had resumed his regular activities of daily living. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) (Significant daily activities may be inconsistent with claims of disabling pain). The ALJ also considered plaintiff's disability paperwork and July 2009 appointment with Dr. Wolkowitz, all of which supported plaintiff's discontinued use of prescription pain medication.

"Because plaintiff could not initially establish [his] disability, it was not incumbent upon the ALJ to search out avenues through which disability could be supported." Wimbly v. Colvin, 4:10-CV-868 (E.D. Mo. Nov. 5, 2013). Furthermore, "[t]here is no indication that the ALJ felt unable to assess [p]laintiff's RFC based on the evidence in the record, nor does [p]laintiff indicate what medical evidence the ALJ should have obtained." Potter v. Astrue, 4:12-CV-1002 (E.D. Mo. Sept. 4, 2013) (citing Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)) ("Without informing the court what additional medical evidence should be obtained . . . [plaintiff] has failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence.").

Accordingly, the Court finds that the ALJ was not obligated to further develop the record and that the ALJ did not err in failing to obtain additional information.

### Credibility Assessment

Plaintiff argues that the ALJ improperly rejected his testimony regarding the severity of his back and leg pain when the ALJ determined that plaintiff is able to cook, wash dishes, sweep, drive, attend his children's school activities, talk on the phone, handle his personal finances, read, use a computer, and text.

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the

-19-

claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions." "The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). The ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the Court will usually defer to the ALJ. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

The ALJ provided good reasons, based on substantial evidence, for discrediting plaintiff's testimony regarding the severity of his impairments. As discussed above, the ALJ noted the lack of any significant restrictions imposed by plaintiff's physicians. In fact, instead of imposing restrictions, the doctors discontinued plaintiff's narcotic pain medication encouraged him to increase his physical activity. When the record does not reflect physician imposed restrictions, an inference can be made that a plaintiff's restrictions in daily activities are self-imposed rather than a medical necessity. See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004); Brown v. Charter, 87 F.3d 963, 965 (8th Cir. 1996) (Lack of significant medical restrictions inconsistent with claimant's complaints of disabling pain). Additionally, plaintiff testified that the use of a cane was not prescribed by a physician and there was no mention in the medical record of the necessity for an ambulation assisting device.

The ALJ's credibility analysis also involved a thorough review of the medical record, which documented plaintiff's reports of decreased pain, an ability to walk farther distances, the capacity to resume activities of daily living, resolved lower extremity pain, and a lack of medication side effects. The plaintiff wrote in his supplemental report that he goes shopping once a week, is able to perform car maintenance and minor home repairs, is able to do laundry and dishes if he is sitting, can take out the trash, and drive. These reports are contrary to plaintiff's testimony of various exertional limitations. See Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008) ("An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole."); Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999) (The fact that plaintiff has some pain or discomfort does not mandate a finding of disability). Also, in further support of the ALJ's credibility finding, plaintiff's most recent medical reports reflect highly conservative treatment consisting of leg stockings, neck exercises, and at home physical therapy. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2011) (Conservative treatment can be a consideration in evaluating credibility).

Accordingly, the Court finds that the ALJ's credibility finding is supported by good reasons and substantial evidence.

### Obesity Analysis

Plaintiff argues that his obesity was improperly evaluated due to the ALJ's failure to obtain additional evidence. In support of this argument, plaintiff refers to the Appeals Council's remand order, which directed the ALJ to obtain additional evidence regarding plaintiff's obesity. See Appeals Order, Tr. 71.

The Court finds that the ALJ did err in disregarding the Appeals Council's directive to obtain additional information regarding plaintiff's obesity. However, while

"the ALJ may have committed legal error . . . that is not the focus of the present inquiry . . . [T]he court's role is to determine whether the [ALJ's] findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole." Hill v. Astrue, 1:12-CV-56 (E.D. Mo. Aug. 20, 2012).

In the instant case, the ALJ did not consider obesity to be a severe impairment. In making this determination, the ALJ took note of the fact that on January 2009 plaintiff had a body mass index of 45, which was consistent with obesity. The ALJ wrote that there was some initial concern that the claimant's obesity would affect his post-surgical recovery, but that there was no indication it was compromised. The ALJ further noted that there was no evidence of obesity-related complications to any body system.

Substantial evidence in the record supports the ALJ's obesity determination. The record as a whole reflects that plaintiff's obesity did not cause post-surgical complications or disabling impairments. Although Dr. Haney wrote that plaintiff's edema was "dependent due to obesity" and instructed plaintiff to take diuretics and lose weight, this was the only note in the record that attributed plaintiff's edema to obesity. (Tr. 450). Also, Dr. Haney later wrote that the edema was improving with use of diuretics. (Tr. 451). On February 23, 2009, Dr. Kuhns noted an elevated BMI, but did not attribute any symptoms to obesity. On February 6, 2011, plaintiff's physician prescribed high knee compression stockings and instructed that they would likely reduce the edema. There was no instruction that plaintiff reduce his weight to decrease the symptoms. (Tr. 468-471). Other than these and other general notations of obesity, none of his physicians expressed a concern that his obesity caused disabling symptoms or that plaintiff was limited in activities due to obesity. Additionally, plaintiff did not

testify to any problems or restrictions caused by his obesity and did not list it as an impairment in his disability paperwork.

Accordingly, the Court finds that the ALJ's determination regarding plaintiff's obesity is based upon the record as a whole and the ALJ's failure to obtain additional evidence is not reversible error. See Hill v. Astrue, 1:12-CV-56 (E.D. Mo. Aug. 20, 2012).

### Edema/Cellulitis

Plaintiff argues that the ALJ erred by failing to determine that plaintiff's lower extremity cellulitis/edema was a severe impairment.

In support of this finding, the ALJ discussed plaintiff's three-day hospitalization in November 2007 for cellulitis; plaintiff's follow-up venous doppler that was negative for deep vein thrombosis; acknowledged plaintiff's occasional bouts of left leg cellulitis; and noted the lack of medical evidence supporting plaintiff's testimony that he was instructed to keep his legs elevated throughout the day.

However, despite the determination that plaintiff's cellulitis/edema was not severe, the ALJ considered the symptoms associated with these conditions throughout the RFC analysis. The ALJ noted that in February 2009, plaintiff reported to Dr. Kuhns that he was "doing quite well" and that the physical examination revealed full lower extremity strength and negative straight leg raising. The ALJ noted that in March 2009 plaintiff reported his condition to be better than before his surgery, that he was able to walk farther distances and sit or stand for about an hour, that he experiences some sharp pain when rising from bed, and that he has occasional left foot numbness. Upon physical examination, plaintiff had full motor strength and was encouraged to walk. The ALJ noted that in June 2009, plaintiff reported to Dr. Kuhns that despite being unable

to lift heavy objects, he had resumed his regular activities of daily living. A physical examination showed that plaintiff could rise from a chair and walk without significant difficulty. Additionaly, the ALJ noted the July 2009 physical examination in which Dr. Wolkowitz found full range of motion and an absence of weakness or numbness in the lower extremities.

After a thorough review of plaintiff's medical record, the Court finds that the ALJ's determination is supported by substantial evidence. Furthermore, even if the ALJ did err in this determination, that error was harmless. "[F]ailing to find a particular impairment severe does not require reversal where the ALJ considers all of a claimant's impairments in his or her subsequent analysis." Hankinson v. Colvin, 2013 WL 1294585, *12 (E.D. Mo. Mar. 28, 2013) (citing Spainhour v. Astrue, 2012 WL 5362232, *3 (W.D. Mo. Oct. 30, 2012)) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments . . . such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC.").

Accordingly, the Court finds no error in the ALJ's determination that plaintiff's cellulitis/edema were not severe impairments.

## B. Vocational Expert Testimony

Lastly, plaintiff argues that the ALJ relied on erroneous vocational expert testimony that plaintiff has the ability to work as a collator operator, price marker, and bench assembler, which are defined in the Dictionary of Occupational Titles (DOT) as light work requiring lifting/carrying up to 20 pounds occasionally and 10 pounds

frequently.[14] Plaintiff argues that because the ALJ gave plaintiff a 10 pound maximum lifting/carrying limitation, the testimony that plaintiff can work these occupations is incorrect and should not have been relied upon by the ALJ.

The DOT addresses "occupations," which are broad categories representing numerous jobs. See Social Security Ruling (SSR) 00-4p, 2000 WL 1898704, at *2. "'DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than the range.' The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000) (quoting Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997)). However, an ALJ must inquire about any apparent conflicts between the DOT and a vocational expert's testimony. See SSR 00-4p, at *4. If there is a conflict, the DOT controls unless the DOT classifications are rebutted. See Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010); see also SSR 00-4P, at *3 (explaining that an apparent conflict between the DOT and expert testimony may be reasonably explained by the fact that the DOT "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.").

In the instant case, the vocational expert's testimony did not rebut the DOT's description of a collator operator, price marker, and bench assembler. The vocational

---

[14] DOT §§ 208.685-010 (Collator Operator); 209.57-0.34 (Marker); 706.684-042 (Bench Assembler). All defined as "Light Work - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2.3 of the time)[.]").

expert failed to explain why an individual with a 10 pound lift/carry limitation would be able to perform occupations that require the ability to lift/carry 20 pounds occasionally. "An ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT, unless there is evidence in the record to rebut those classifications." Chaney v. Astrue, 1:11-CV-183 (Mo. E.D. Feb. 28, 2013) (citing Hillier v. SSA, 486 F.3d 359, 366 (8th Cir. 2007)); see also Smith v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995) (citing McCoy v. Schweiker, 638 F.2d 180, 186 (8th Cir. 1982)) (In the general run of cases the DOT is more reliable than a vocational expert). The ALJ incorrectly determined that "the vocational expert's testimony is consistent with the information contained in the [DOT]." (Tr. 16). The Court, therefore, finds that substantial evidence on the record does not support the ALJ's reliance on the vocational expert's testimony.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner properly determined plaintiff's residual functional capacity. However, the Court also finds that that the Commissioner failed to address the conflict between the vocational expert testimony and the DOT and, thus, improperly relied on the testimony,

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate judgment in accordance with this Memorandum and Order will be entered.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 11th day of march, 2014.